UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LUIS ACEVEDO,

                      Plaintiff,

v.                                                     Case No. 21-cv-14-pp

HEATHER NICHOLS, RHONDA S. MOHLER,
JAMES M. BILLINGS, STEVEN D. PICERNE
and REGINALDO ARBOLEDA,

                      Defendants.

---

**ORDER SCREENING PLAINTIFF'S COMPLAINT UNDER 28 U.S.C. §1915A**

---

Luis Acevedo, an inmate at Oakhill Correctional Institution who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants inadequately treated his finger injury, causing permanent loss of use and disfigurement. On January 15, 2021, the court received the full $402 filing fee. This decision screens his complaint. Dkt. No. 1.

**I.    Screening the Complaint**

    A.    <u>Federal Screening Standard</u>

Under the PLRA, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

1

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. The Plaintiff's Allegations

The complaint concerns events that allegedly occurred while the plaintiff was incarcerated at the Wisconsin Resource Center (WRC). Dkt. No.1 at ¶3. He sues registered nurses Heather Nichols and Rhonda S. Miller and doctors James M. Billings, Steven D. Picerne and Reginaldo Arboleda. Id. at ¶¶4–5. All the defendants were employed at WRC. Id. The plaintiff sues the defendants in their individual and official capacities. Id. at ¶6.

The complaint alleges that on December 26, 2018, the plaintiff was playing basketball when he tangled his finger in the net. Id. at ¶8. He says he "felt a 'pop,' like a rubber band snapping, then felt an extremely painful sensation shoot up his arm." Id. The injury was "visibly apparent" by the time he went for treatment: He says his finger "was swollen and discolored, and would not move." Id. at ¶9. Nurse Mohler saw the plaintiff about his finger injury. Id. at ¶10. The plaintiff reported that he could not move his finger, had heard a "popping" sound and had a shooting pain up his arm. Id. at ¶15. He reported his pain "as a 9 out of 10." Id. at ¶17. Mohler examined the plaintiff's finger, "buddy taped" it and advised him to take Tylenol and to rest, ice and elevate his finger. Id. at ¶¶17–18; Dkt. No. 1-1 at 3. Mohler determined that the injury was not serious and required no further treatment. Dkt. No. 1 at ¶14. Mohler allegedly did not tell the plaintiff not to use his finger, and the plaintiff says he was unaware that he shouldn't. Id. at ¶¶15–16. Because Mohler did not tell the plaintiff to stop playing basketball, he returned to the game but

3

"primarily us[ed] his uninjured hand," despite staff encouraging him not to play. Id. at ¶16; Dkt. No. 1-1 at 3.

The next day—December 27, 2018—the plaintiff wrote to the Health Services Unit (HSU) that his finger was "swollen, purple, and will not bend, and in pain." Dkt. No. 1 at ¶19. The HSU called the plaintiff back to the treatment room, where he saw Nurse Nichols. Id. The plaintiff told Nichols that he was "still" in extreme pain, 9 out of 10, that the pain prevented him from sleeping and that it was "unbearable." Id. at ¶20. He says that Nichols observed swelling, bruising and decreased range of motion. Id. He asked to be seen by a doctor. Id. Nichols told the plaintiff to continue taking Tylenol, continue resting, icing and elevating his finger and to stop using his finger. Id. at ¶21. The plaintiff responded that he had done all those things, but his finger remained in significant pain. Id. Nichols told the plaintiff to report back if his condition did not improve in a few days. Id. at ¶22.

The plaintiff says health staff are supposed to triage patients by conducting a "Pain Assessment" under WRC policies. Id. at ¶11. Staff ask the patient about the intensity and characteristics of the pain, the location, the onset and duration, any symptoms and what has helped relieve the pain. Id. at ¶12. This assessment must be recorded in the patient's medical record. Id. After the pain assessment, the nurse consults with a health services provider to determine a course of treatment. Id. at ¶13. The plaintiff alleges that Mohler and Nichols failed to follow WRC's Pain Assessment policies when they examined him. Id. at ¶23.

4

On January 4, 2019, after submitting another health services request, the plaintiff was seen by Mohler. Id. at ¶25. He says the finger was still swollen and bruised and that any movement of his hand caused sharp, intense pain shooting from his finger up his forearm. Id. Mohler decided to refer the plaintiff to a doctor and forwarded his health services request to the doctor. Id. at ¶26. Mohler indicated that the plaintiff showed "much improvement from previous assessment;" he observes that even though she thought his injury was more serious the first time she saw him, Mohler didn't refer him to a doctor until the second visit, when she considered him improved. Id. He points out that January 4, 2019 was a Friday; he says he ought to have been seen as quickly as possible because he believes his symptoms were indicative of a connective tissue injury, which need to be caught as quickly as possible. Id. at ¶28. He says that he didn't see a doctor until the following Tuesday, and that in the interim, he was still in much pain and had no treatment. Id.

Four days later, on January 8, 2019, the plaintiff saw Dr. Billings about his finger. Id. at ¶29. Dr. Arboleda supervised Billings. Id. The plaintiff says that at the start, Billings had the timeline wrong—Billings stated that the injury had occurred a week ago, when it had been fourteen days since the injury. Id. The plaintiff explained his symptoms and told Billings that the medication and ice had not improved his pain; he said that the pain was impacting his ability to sleep, work, exercise and concentrate. Id. at ¶31. Billings and Arboleda concluded the plaintiff had a "possible tendon tear on his right hand fourth finger." Id. at ¶32. They scheduled an x-ray of his finger for

5

Case 2:21-cv-00014-PP   Filed 05/23/22   Page 5 of 18   Document 9


On January 4, 2019, after submitting another health services request, the plaintiff was seen by Mohler. Id. at ¶25. He says the finger was still swollen and bruised and that any movement of his hand caused sharp, intense pain shooting from his finger up his forearm. Id. Mohler decided to refer the plaintiff to a doctor and forwarded his health services request to the doctor. Id. at ¶26. Mohler indicated that the plaintiff showed "much improvement from previous assessment;" he observes that even though she thought his injury was more serious the first time she saw him, Mohler didn't refer him to a doctor until the second visit, when she considered him improved. Id. He points out that January 4, 2019 was a Friday; he says he ought to have been seen as quickly as possible because he believes his symptoms were indicative of a connective tissue injury, which need to be caught as quickly as possible. Id. at ¶28. He says that he didn't see a doctor until the following Tuesday, and that in the interim, he was still in much pain and had no treatment. Id.

Four days later, on January 8, 2019, the plaintiff saw Dr. Billings about his finger. Id. at ¶29. Dr. Arboleda supervised Billings. Id. The plaintiff says that at the start, Billings had the timeline wrong—Billings stated that the injury had occurred a week ago, when it had been fourteen days since the injury. Id. The plaintiff explained his symptoms and told Billings that the medication and ice had not improved his pain; he said that the pain was impacting his ability to sleep, work, exercise and concentrate. Id. at ¶31. Billings and Arboleda concluded the plaintiff had a "possible tendon tear on his right hand fourth finger." Id. at ¶32. They scheduled an x-ray of his finger for

the same day and advised the plaintiff to continue icing his hand three times a day and to tape his third and fourth fingers together "to immobilize his right fourth finger." Dkt. No. 1-1 at 4. The plaintiff alleges that the doctors did not prescribe additional pain medication, dkt. no. 1 at ¶32, but the progress notes from his appointment show they prescribed 600mg of ibuprofen on top of the Tylenol previously prescribed, dkt. no. 1-1 at 4.

Dr. Picerne conducted the x-ray of the plaintiff's hand the same day and concluded that there was no fracture and no abnormality. Dkt. No. 1 at ¶¶34–35. The plaintiff alleges that Picerne "either did not conduct a proper X-ray, or he did not properly read the X-ray results." Id. at ¶36. The plaintiff alleges that Picerne failed to identify an "FDP rupture, or hyperextension, referred to as 'Jersey finger,'" which should have been visible on the x-ray results. Id.

The plaintiff alleged that he "was not seen in two days for his follow-up appointment that was to be scheduled." Id. at ¶37. He alleges he was not seen again until January 15, 2019, at which point Arboleda determined that he should be sent to a hand surgeon at a local hospital in Oshkosh, Wisconsin. Id. at ¶37. Arboleda maintained that the plaintiff had a tendon injury, but the plaintiff insisted his pain was "severe and chronic" and that the prescribed ibuprofen and Tylenol were not helping his pain and were causing him severe stomach pain and diarrhea. Id. ¶38. The plaintiff told Arboleda that the pain was affecting his daily life activities, including writing, brushing his teeth and sleeping. Id. at ¶39. Nonetheless, Arboleda allegedly did not prescribe

6

additional medication or change the plaintiff's treatment plan beyond referring him to the hand specialist. Id.

On January 31, 2019, the plaintiff was sent to the hospital to treat his finger. Id. at ¶40. He alleges that, in the interim, "he waited in pain, and his injury got older." Id. Dr. Kenneth Schaufelberger (who is not a defendant), diagnosed the plaintiff with "mild to moderate hyperextension at the DIP joint of the ring finger with no osseous abnormalities." Id. The plaintiff insists that Picerne should have made that diagnosis when he x-rayed the plaintiff's finger a few weeks earlier. Id. Schaufelberger recommended sending the plaintiff to the Hand to Shoulder Center of Wisconsin to repair his finger. Id. at ¶41.

On February 6, 2019, the plaintiff had an appointment at the Hand to Shoulder Center, where the treating physician (whose name the plaintiff does not provide) told the plaintiff that "it was now too late for primary repair." Id. at ¶42. He told the plaintiff that he could perform an "FDP excision," that he could perform a two-stage reconstruction or that the plaintiff could live with the injury as it was. Id. The plaintiff chose the FDP excision, which the Hand to Shoulder Center completed a month later. Id. at ¶43. The plaintiff alleges that he "was in the same deplorable condition concerning his pain management," was in constant pain and experienced even more severe pain from "the smallest bump, or movement of plaintiff's hand/finger." Id. He alleges he suffered permanent damage, loss of full range of motion of his finger and "a serious

7

amount of unnecessary pain." Id. at ¶44. He alleges that his quality of life was permanently destroyed. Id.

The plaintiff seeks to proceed on claims against the defendants under federal and state law. Id. at ¶¶46–47. He seeks declaratory judgment and compensatory and punitive damages. Id. at ¶¶47(B)–(D).

C. Analysis

   1. *Official Capacity Claims*

Claims against a state employee in his or her official capacity represent another way to plead an action against the entity that the state employee represents or for which that employee works. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, n.55 (1978)). The plaintiff alleges that the defendants work for the WRC, which the Wisconsin Department of Health Services manages with the Department of Corrections. See https://www.dhs.wisconsin.gov/wrc/index.htm. The court construes the claims against the defendants in their official capacities as having been brought against the Department of Health Services, the agency for which they work. Graham, 473 U.S. at 165–66. Because claims against a state agency are "no different from a suit against the State itself," the court construes these claims as if the plaintiff brought them against the State of Wisconsin. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Graham, 473 U.S. at 165–66; Monell, 436 U.S. at 690 n.55). But a state is not a "person" against whom the plaintiff may recover monetary damages under §1983. Lapides v. Bd. of Regents of the Univ. Sys. of

Ga., 535 U.S. 613, 617 (2002); Williams v. Wisconsin, 336 F.3d 576, 580 (7th Cir. 2003).

In addition to damages, the plaintiff seeks declaratory relief. The defendants work at WRC, where these events occurred. But the plaintiff since has been transferred to another facility, and he does not allege that he expects to return to WRC. Because the plaintiff no longer is at the facility where the defendants work, "a declaratory judgment would not affect [the defendants'] behavior towards [the plaintiff]." Pearson v. Welborn, 471 F.3d 732, 743 (7th Cir. 2006) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 103–04 (1983), and Davis v. District of Columbia, 158 F.3d 1342, 1348 (D.C. Cir. 1998)). The plaintiff's request for declaratory relief is moot. See Bigbee v. Nalley, 482 F. Supp. 2d 1092, 1099 (W.D. Wis. 2007) (citing Robinson v. City of Chi., 868 F.2d 959, 966 n.5 (7th Cir. 1989), and Higgason v. Farley, 83 F.3d 807, 811 (7th Cir. 1996)). He may not seek declaratory relief against the defendants in their official or individual capacities.

Because the court construes the plaintiff's official capacity claims as against the State of Wisconsin, and the plaintiff's only available relief of monetary damages is not recoverable against a state, the plaintiff may not proceed on his claims against the defendants in their official capacities.

2. *Individual Capacity Claims*

The court reviews the plaintiff's claims regarding the denial of proper medical care under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain,

9

including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the inmate must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see Estelle, 429 U.S. at 103. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez, 792 F.3d at 776 (citing Farmer, 511 U.S. at 837).

The plaintiff's allegations that the defendants delayed treating his "non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged [his] pain." Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011) (citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). What period of delay is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" Id. (quoting McGowan, 612 F.3d at 640). In certain circumstances, "even brief, unexplained delays in treatment may constitute deliberate indifference." Lewis

10

v. McLean, 864 F.3d 556, 563 (7th Cir. 2017) (quoting Perez, 792 F.3d at 777–78).

The complaint's allegations satisfy the objective component. The plaintiff alleges that he injured his finger, causing him severe pain, loss of use of his finger, discoloration and swelling. He alleges that the pain continued for weeks before he received treatment from a hand specialist. Although not life-threatening, the plaintiff's allegations about his persistent pain qualify as an objective serious medical condition for purposes of an Eighth Amendment claim. See Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002) (noting that allegations of severe and persistent pain may constitute a serious medical need to satisfy the objective component).

Whether the complaint's allegations satisfy the subjective component is a tougher call. An incarcerated person's dissatisfaction or disagreement with a course of treatment does not mean the medical defendants were deliberately indifferent. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) (citing Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)). Nor are medical defendants deliberately indifferent if they make a mistake or misdiagnose an incarcerated person's condition. Grant v. Heidorn, 802 F. App'x 200, 205 (7th Cir. 2020) (citing Cesal v. Moats, 851 F.3d 714, 724 (7th Cir. 2017)) ("[F]ailing to correctly diagnose a condition is evidence of negligence, not deliberate difference."); Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation."). Medical

defendants are constitutionally liable only if the treatment provided is "grossly inadequate," Pyles, 771 F.3d at 408, or "blatantly inappropriate," Greeno v. Daley, 414 F.3d 645, 654 (7th Cir. 2005); that is, if their actions "suggest that the officials actually want the prisoner to suffer the harm." Jackson v. Duckworth, 955 F.2d 21, 22 (7th Cir. 1992).

The complaint does not state a claim against Nurse Mohler. The plaintiff alleges he first saw Mohler immediately after injuring his finger. Mohler did not ignore the plaintiff's injury or disregard his pain. She wrapped his finger, gave him medication and told him to rest, ice and elevate his finger. The plaintiff insists he promptly should have been seen by a doctor, but he does not allege what a doctor could have or would have done differently at that time to treat his injury. (When the plaintiff did later see a doctor, the course of treatment the doctor prescribed was nearly identical to what Mohler prescribed.)[1] When the plaintiff saw Mohler again a week later and complained of persistent pain, she scheduled him to see a doctor. The complaint does not suggest that Mohler disregarded the plaintiff's finger injury or wanted him to suffer harm. It alleges that she treated the plaintiff's injury based on the information the plaintiff gave her at the time. When the course of treatment did not help, Mohler scheduled

---

[1] The plaintiff also says he continued to play basketball after Mohler initially treated and wrapped his finger because she did not tell him not to. The exhibits the plaintiff attached to his complaint show that recreation staff advised the plaintiff to sit out the remainder of the game, but that he "continued to play." Dkt. No. 1-1 at 3. Even if Mohler did not tell the plaintiff to stop using his injured finger to play basketball, common sense should have. While it is impossible to know, the plaintiff could have worsened his injury because he decided to ignore the pain and play the game, not because he did not see a doctor on December 26, 2019.

12

the plaintiff for a visit with a doctor. Even if this was not the treatment the plaintiff wanted or believed he ought to have received, it did not constitute deliberate indifference sufficient to state a constitutional violation.

The complaint alleges that Nurse Nichols saw the plaintiff one day after his injury. Nichols allegedly told the plaintiff to continue the course of treatment that Mohler had prescribed, but the plaintiff told her that treatment had not improved his symptoms. Despite that information, Nichols did not alter the course of treatment but told the plaintiff to report back in a few days if his condition had not improved. The progress notes attached to the complaint suggest that the plaintiff may not have been strictly following Mohler's prescribed course of treatment. The plaintiff informed Nichols that he had iced his finger "a couple times" and had taken Tylenol for pain. Dkt. No. 1-1 at 3. He also refused to have his finger buddy-taped a second time. Id. It appears possible that the plaintiff did not follow the treatment plan and allowed his finger to worsen. But at this stage of the proceedings the court must accept the complaint's allegations as true. As alleged, the plaintiff reported continued pain despite following Mohler's treatment plan, but Nichols refused to alter the course of treatment or send him to see a doctor. Her actions possibly could have constituted deliberate indifference to the plaintiff's injury and pain. See Greeno, 414 F.3d at 655 (noting possible claim of deliberate indifference against prison officials who "doggedly persist[] in a course of treatment known to be ineffective"). The court will allow the plaintiff to proceed against Nichols.

The complaint alleges that Doctors Billings and Arboleda did not properly assess the plaintiff's finger injury, failed to provide him effective pain medication and should have sent him to a specialist sooner. But the complaint also shows that the doctors examined the plaintiff's injury, scheduled him for an x-ray the same day and followed up within a week. Contrary to the plaintiff's assertion that he was given no pain medication, the progress notes show that Billings prescribed the plaintiff 600mg ibuprofen three times a day on top of the Tylenol Mohler had prescribed. Dkt. No. 1-1 at 4. The doctors also advised the plaintiff to buddy-tape his third and fourth fingers together (just as Mohler had instructed). Id. When the plaintiff informed Arboleda a week later that his pain was continuing, the doctor did not persist in the same course of treatment but sent the plaintiff to a hand specialist for evaluation. That the hand specialist was not immediately available to see the plaintiff does not mean Billings and Arboleda were deliberately indifferent to the plaintiff's injury. Nor was the fact that their own treatment did not alleviate the plaintiff's pain indicative of deliberate indifference. The plaintiff was not completely satisfied with the medical treatment he received. But that does not mean the doctors who treated him violated his constitutional rights. The complaint does not state a claim of deliberate indifference against Billings and Arboleda.

The complaint alleges that Dr. Picerne misread the x-ray and misdiagnosed the plaintiff's injury, further delaying proper treatment for his finger. But the complaint does not suggest that Picerne deliberately or intentionally misdiagnosed the plaintiff's injury or misreported the results of

the x-ray. At most, the plaintiff's allegations could support a claim that Picerne committed medical malpractice when he missed the hyperextension that a later x-ray revealed. That is not a basis for liability under the Eighth Amendment. See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The court will not allow the plaintiff to proceed against Picerne.

To the extent the plaintiff asserts that the defendants failed to follow WRC policies or protocol, he has not stated a claim for a constitutional violation. Section 1983 protects against *constitutional* violations. It does not protect against violations of departmental or prison regulations or policies unless those violations rose to the level of constitutionally deliberate indifference. See Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017) Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003).

The plaintiff seeks to proceed on state law claims of negligence against Nurses Mohler and Nichols and medical malpractice against Doctors Billings, Arboleda and Picerne. The court will exercise supplemental jurisdiction over the plaintiff's state law claim of negligence against Nichols. 28 U.S.C. §1367. Because the court is dismissing the remainder of the plaintiff's federal claims, it will not exercise supplemental jurisdiction over his state law negligence claim against Mohler or his claims of medical malpractice against the doctors. Id. §1367(c)(3).

On March 29, 2022, the court received from the plaintiff a letter asking about the status of this case. Dkt. No. 8. He also asked "leave to file an

15

Amended Complaint in this case." Id. The court's Civil Local Rules require that a party moving to amend his complaint must "reproduce the entire pleading as amended," attach the proposed amended pleading to the motion and "state specifically what changes are sought by the proposed amendments." Civil Local Rules 15(a)–(b) (E.D. Wis.). The plaintiff did not attach a proposed amended complaint to his letter and did not say what specific changes he proposes. Because the plaintiff's request does not comply with the court's local rules for amended pleadings, the court will deny without prejudice his request to file an amended complaint. See Hinterberger v. City of Indianapolis, 966 F.3d 523, 528 (7th Cir. 2020) ("[D]istrict courts may require strict compliance with their local rules."); Smith v. Adams, 804 F. App'x 390, 391 (7th Cir. 2020) (same for *pro se* plaintiffs).

## II. Conclusion

The court **DENIES WITHOUT PREJUDICE** the plaintiff's request to file an amended complaint. Dkt. No. 8.

The court **ORDERS** that defendants Mohler, Billings, Picerne and Arboleda are **DISMISSED**.

Under an informal service agreement between the Wisconsin Department of Justice and the court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendant Heather Nichols. Under the informal service agreement, the court **ORDERS** the defendant to respond to the complaint within 60 days.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and completing dispositive motions.

The court **ORDERS** that plaintiffs who are in custody at Prisoner E-Filing Program institutions[2] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are in custody at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

THE PLAINTIFF MUST NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court

---

[2] The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

advised of his address may result in the court dismissing the case without further notice.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin this 23rd day of May, 2022.

<div style="text-align: right;">

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

</div>